UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **CIV-JORDAN**

MAGISTRATE JUDGE
BROWN

SECURITIES AND EXCHANGE COMMISSION, )
)
Plaintiff, )
)
v. )
)
HELVETIA PHARMACEUTICALS, INC., )
RICHARD A. ANDERS, )
NICHOLAS BACHYNSKY, )
ARTHUR SCHEINERT and )
LAURENCE DEAN, )
)
Defendants. )
)

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Securities and Exchange Commission ("Commission") alleges that:

### I. INTRODUCTION

1. The Commission brings this action to enjoin Defendants from further violating of the antifraud and registration provisions of the federal securities laws in offering securities issued by Defendant Helvetia Pharmaceuticals, Inc. ("Helvetia" or "the Company"). From approximately January 2001 through August 2002, Helvetia, through self-proclaimed president Richard A. Anders, medical director Nicholas Bachynsky, senior vice president Arthur Scheinert and chief financial officer Laurence Dean, raised more than $3.2 million from approximately 50 investors nationwide. Helvetia claimed to treat certain types of cancer at European clinics using a supposedly new, unique, and proprietary therapy. None of Helvetia's securities were registered with the Commission as required.



2. Helvetia's offering materials failed to disclose that its drug therapy included the use of Dinitrophenol ("DNP"), a banned, hazardous substance that could cause medical complications, and even death. Helvetia's offering materials also failed to disclose that Anders had been convicted of securities fraud. They also did not disclose that Bachynsky, the purported inventor of Helvetia's cancer therapy, had been convicted of conspiracy to defraud the Internal Revenue Service in connection with a deceptive healthcare scheme, that caused the State of Texas to strip him of his medical license.

3. The Commission also seeks permanent injunctions against all defendants, an officer and director bar against Anders, and a penny stock bar against Anders, Bachynsky, Scheinert and Dean. Unless permanently enjoined, Defendants are likely to violate the federal securities laws in the future.

## II. DEFENDANTS

4. Defendant Helvetia is a Delaware corporation with its headquarters in Coral Springs, Florida. The State of Florida administratively dissolved Helvetia's Florida registration in September 2003 after Helvetia failed to file an annual report.

5. Defendant Anders is 49 and resides in Fort Lauderdale, Florida. Anders represented himself both as Helvetia's President and as Helvetia's "President, Investor Relations," and was an undisclosed principal of Helvetia. Anders presently is under arrest and in custody at the Federal Detention Center in Miami, Florida.

6. Defendant Bachynsky is 61, and his residence is unknown. Bachynsky was Helvetia's medical director and he purportedly invented Helvetia's cancer treatment program. He presently is under arrest and in custody at the Federal Detention Center in Miami, Florida.

7. Defendant Scheinert is 39 years old and resides in Hollywood, Florida. Scheinert

was Helvetia's senior vice president.

8.     Defendant Dean is 58 years old and resides in Pompano Beach, Florida. Dean was Helvetia's chief financial officer. He presently is under arrest and in custody at the Federal Detention Center in Miami, Florida.

### III.  JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

10.    This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida because many of the Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida. In addition, the headquarters of Defendant Helvetia were located in the Southern District of Florida, and Defendants Anders, Scheinert and Dean reside in the Southern District of Florida.

11.    Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

## IV. HELVETIA'S FRAUDULENT OFFERING AND ITS MATERIAL MISREPRESENTATIONS AND OMISSIONS

### A. Overview of Helvetia's Unregistered Offering

12. From January 2001 to August 2002, Helvetia raised approximately $3.2 million from more than 50 investors nationwide through the sale of stock and promissory notes. Defendants engaged in a general offering of Helvetia securities with little or no investigation of the financial background of the prospective investors they solicited. Defendants solicited people they met through acquaintances, simply in passing, or in at least one case, as a patient at a cancer clinic. Defendant Scheinert additionally received commissions for the investors he recruited.

13. Helvetia purported to treat cancer patients at European clinics using an "intracellular hyperthermia therapy methodology" ("IHT") developed and administered by an undisclosed medical expert, who in reality was Bachynsky. Helvetia's offering materials made baseless forecasts that it would be profitable in 2002 with revenues of $19 million that would rise to $100 million by 2005. During this same time period, Helvetia, through the Defendants and other agents, told investors that the company was preparing to go public, either through an initial public offering or by merging with a publicly traded shell entity, and that this would generate large profits for investors.

14. According to Helvetia's offering materials, which were dated either January 2001 or May 2001, the IHT treatment applies heat, "from the 'inside to the outside,'" at a sub-cellular level to destroy cancerous cells without the health risks and technical problems of other treatments. Helvetia's offering materials stated it would use United States Food and Drug Administration protocols in administering, documenting, and analyzing this supposedly "unique and new" treatment, but noted that it would not seek FDA approval for clinical trials or be

4

subject to that agency's rules and regulations because of the associated costs and length of time.

15. Defendants, either themselves or through other Helvetia agents they directed, supplied prospective investors with Helvetia's offering materials without disclosing that these materials were riddled with misrepresentations and material omissions about the identity and background of the Defendants and Helvetia's potential or actual corporate officers, Helvetia's financial health and prospects, the legality and safety of the substances and techniques Helvetia would use in its IHT treatment, how Defendants would use investor funds, the nature of the Helvetia securities investors purchased, and the likelihood of Helvetia becoming a publicly-traded company.

16. Helvetia's offering materials indicated the investment was limited to accredited investors, but Defendants nevertheless permitted non-accredited investors to invest. Investors executed subscription agreements that usually indicated, among other things, the number of Helvetia common shares purchased for $1.00 per share. Upon receipt, Defendant Dean signed the subscription agreements on behalf of Helvetia and also signed the stock certificates sent to investors.

17. During the January 2001 to August 2002 Helvetia offering, Defendants furnished prospective investors with Helvetia's fraudulent offering materials and made numerous misrepresentations and material omissions. These misrepresentations and omissions addressed the same subjects as Helvetia's offering materials. In addition, they misrepresented Helvetia's share price or investors' return on their investment when Helvetia went public, how Helvetia would go public, the ability of Helvetia investors to get their money back or sell their stock whenever they wanted, and how Helvetia's treatment and clinics operated.

18. Defendants never filed a registration statement with the Commission, nor was

there ever one in effect in connection with the securities offered and sold by Helvetia.

### B. Material Misrepresentations and Omissions in Connection with Helvetia's Stock Offering

19. Defendants, through mailings, telephone calls and personal conversations, provided fraudulent Helvetia offering materials or made other material misrepresentations and omissions to one or more prospective investors to convince them to purchase Helvetia securities. Dean was deeply involved in the daily operations and control of Helvetia's funds. He also sent at least one investor a letter enclosing Helvetia's business plan and subscription agreement and misrepresenting the Company's actions and plans for going public, in order to entice that investor to execute a new subscription agreement and complete his purchase of Helvetia securities.

20. Dean incorporated Helvetia in Delaware in February 2001, signed Helvetia's foreign corporation application to transact business in Florida in February 2001, and was aware of the offering materials and investor solicitations. He also sent at least one investor "revised" offering materials and a renewed subscription agreement and helped verbally recruit an investor by telling him simply that Helvetia had cancer clinics and a cure for cancer. He signed all investor subscription agreements, stock certificates and promissory notes on Helvetia's behalf. Additionally, he signed all company checks, including numerous checks, payable to companies Dean owned or was associated with as an officer or director, while never disclosing this to prospective investors. At least once to get an investor to re-execute his subscription agreement and follow through the actual investment, Dean sent a subscription agreement and business plan, along with a letter misrepresenting Helvetia's plans and steps taken to go public.

### *(i) Failure to Disclose Anders and Bachynsky's Backgrounds*

21. Helvetia's offering materials did not refer to either Anders or Bachynsky by name. The Defendants failed to disclose that the person listed as Helvetia's president was Bachynsky's son, Ashton Bachynsky.

22. At the time Helvetia was distributing its offering materials to prospective investors, Anders was often presenting himself to potential investors as Helvetia's president or as Helvetia's "President, Investor Relations." The offering materials stated the president of Helvetia was directly responsible for numerous functions, including marketing, finance, and accounting, yet these same offering materials, as well as the Defendants, failed to disclose to prospective investors that in 1994 a federal court had convicted Anders of conspiracy to commit securities fraud, securities fraud, wire fraud, and interstate transportation of monies taken by fraud. Helvetia's offering materials and the Defendants additionally failed to disclose that the federal court sentenced Anders to fifty-one months in prison for these crimes. The offering materials and the Defendants also failed to disclose that the Commission previously had barred Anders from association with any broker, dealer, municipal securities dealer, investment adviser, or investment company, from participating in any offering of penny stock, and from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

23. During the Helvetia offering Bachynsky often presented himself to prospective investors as the company's medical director and the inventor of the IHT treatment. Neither Helvetia's offering materials, nor the Defendants disclosed to potential investors that in 1989, a federal court sentenced Bachynsky to ten years in prison for violations of racketeering laws and conspiracy to defraud the Internal Revenue Service relating to a massive healthcare insurance

fraud that he perpetrated. The Defendants and Helvetia's offering materials also failed to disclose to potential investors that Texas had revoked Bachynsky's medical license in 1990.

### *(ii) Failure To Disclose the Health Risks of Helvetia's Treatment*

24. Helvetia's offering materials boasted about its supposedly unique, proprietary cancer treatment, and referred to clinical and university studies that did not pertain to Helvetia's actual treatment technique. These offering materials failed to disclose that Helvetia's drug therapy included the use of DNP, a banned, hazardous substance commonly found in weed killers. Helvetia's offering materials did not discuss the risks associated with DNP or the United States Government's prohibition of its use in treatment because of those risks, despite reports of patient medical complications and death. According to the United States Agency for Toxic Substances and Disease Registry, DNP was sold in the 1930's in diet pills but banned in 1938 because of severe health effects, including death. Neither Helvetia's offering materials nor the Defendants themselves disclosed this to prospective investors.

### *(iii) Failure to Disclose that Helvetia Was Sued for Securities Fraud*

25. Neither the Defendants nor Helvetia's offering materials disclosed to prospective investors that in 2002 four Helvetia shareholders sued Anders, Scheinert and Helvetia, for misrepresentations related to Helvetia's securities offering. In an emergency action filed in 2002, these Helvetia investors obtained a court order freezing Helvetia's bank account. Helvetia settled shortly thereafter in late June 2002, agreeing to pay Plaintiffs approximately $400,000, or about 12% of all the monies Defendants raised from investors. Defendants never disclosed the suit or the related settlement to prospective investors.

26. This settlement represented one of the most significant expenses Helvetia incurred; however the detailed pro forma expense section attached to the company's offering

materials failed to mention it.

### *(iv) Exaggerated Claims of Projected Revenues and Anticipated Returns*

27. The business plan Defendants distributed to prospective investors in connection with Helvetia's offering projected Helvetia would become profitable in 2002, when it also would treat 240 patients and generate patient revenues of $19 million. Helvetia's offering materials also projected that in 2005 the company would treat 1,000 patients resulting in revenues of $100 million.

28. Helvetia had no basis for its projected patient numbers or its anticipated revenues, as Dean in particular knew, since he was the Company's Chief Financial Officer. According to Helvetia's financial statements, as of June 2002, the company had realized only approximately $17,000 in total patient revenue. Defendants therefore knew or recklessly disregarded the fact that Helvetia could not meet or even remotely approach the projections outlined in its offering materials. Defendants failed to disclose these facts to prospective investors.

### *(v) False Claims of Imminent Profits from a Helvetia IPO*

29. During Helvetia's January 2001 to August 2002 offering, Anders, Bachynsky and Scheinert falsely told prospective investors that Helvetia's stock would shortly be publicly traded at a significant profit. Beginning in at least February 2002, Anders, Bachynsky and Scheinert told investors that Helvetia's common stock soon would be publicly traded. After a concerned investor who had cancer contacted Dean because her reimbursement check for calls she made to cancer patients discussing her Helvetia treatment experience bounced, Dean told her the Company had "millions of dollars" in its bank account.

30. In one instance, Anders explained to investors that Helvetia was planning a reverse merger with a publicly traded shell entity, and that after the merger Helvetia's

shareholders would have freely-tradable, non-restricted shares in the successor entity. Anders later told investors that a merger was imminent, but that an SEC inquiry was the only thing keeping Helvetia from going public. He told investors that he expected the shares to trade between $5-$6 per share initially and rise to approximately $30 per share within one to two years.

31. In another instance, Anders persuaded a seriously ill cancer victim to use $50,000 she had saved for treatment to purchase Helvetia stock as way to earn more money for treatment. Anders later told this same cancer victim to use her last healthcare savings to increase her investment in Helvetia since there was a group of sophisticated European dealers prepared to take Helvetia public, ultimately generating more money for her cancer treatments once the stock began trading publicly at higher prices. Anders promised that the IPO would occur within weeks, he would get her unrestricted shares, and if the IPO failed to occur he would return her money because there were many people waiting to participate in the Helvetia IPO. Months later, after the cancer victim made at least two investments in Helvetia stock based on Anders misrepresentations and it was clear that Helvetia was a scam, the investor confronted Anders and asked for her money back to continue her medical treatment. Anders responded with an obscenity.

32. Bachynsky told at least one investor that each $10,000 investment would grow to $60,000 once the stock began to trade. Bachynsky also guaranteed at least one investor that Helvetia stock would be listed and trading within six months.

33. Scheinert also used the purported "imminent public offering" to induce investors to purchase Helvetia stock. Scheinert told at least one investor that Helvetia would go public very shortly, and at that time the price of Helvetia shares would at least double. Based on these

and Scheinert's other misrepresentations, the investor agreed to purchase Helvetia stock.

34. Dean falsely told another investor that Helvetia had millions of dollars in its accounts. In April 2002, Helvetia sent at least one shareholder a letter signed by Dean stating that Helvetia was "taking steps towards seeking a listing on the public markets," and had undergone "an extensive legal and financial audit." The letter enclosed a revised subscription agreement containing a business plan and directing the investor to re-execute the agreement.

35. Anders, Bachynsky and Scheinert misled several investors into thinking they would be able to sell Helvetia shares for a very large profit, sometimes up to 400%-500%, once the stock began publicly trading. These representations were lies. Helvetia could not provide investors with non-restricted stock, and there was never any reasonable basis to claim that Helvetia's share price would increase greatly through any public offering. Helvetia never had audited financial statements and never made any of the necessary filings with the Commission to go public.

### *(vi) Failure to Disclose True Use of Investor Proceeds*

36. Helvetia's offering materials stated that the funds received from investors would be used to operate and expand the business worldwide. But the Defendants used the majority of investors' funds to pay offering expenses, effect exorbitant loans to Helvetia insiders, and pay purported consulting and marketing fees to Helvetia insiders and their family members.

37. For example, Helvetia loaned $200,000 to Bachynsky and $250,000 to two of Dean's companies. Helvetia's financial records show all those loans remain outstanding. Additionally, Dean paid $130,000 of Helvetia investors' money to another one of his companies, Intra-Cellular Hyperthermia, Inc. ("ICH"). ICH did not provide any products or services to Helvetia. Significantly, Dean effected the Helvetia payment to ICH during the last month

Helvetia received funds from investors. The Defendants never disclosed any of these payments to prospective investors, and Helvetia received little or no actual services in return for these payments.

## V. CLAIMS FOR RELIEF

### COUNT I

### Sale of Unregistered Securities in Violation of Sections 5(a) and 5(c) of the Securities Act

### (Against Helvetia, Anders, Bachynsky and Scheinert)

38. The Commission repeats and realleges paragraphs 1 through 37 of this Complaint as if fully set forth herein.

39. No registration statement was filed or in effect with the Commission pursuant to the Securities Act and no exemption from registration exists with respect to the securities and transactions described in this Complaint.

40. From at least January 2001 through August 2002, Defendants directly and indirectly, have: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise; (b) carried securities or causing such securities, as described in this Complaint, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and/or (c) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, as described in this Complaint, without a registration statement having been filed or being in effect with the Commission as to such securities.

41. By reason of the foregoing, Defendants, directly and indirectly, have violated, and unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Fraud in Violation of Section 17(a)(1) of the Securities Act
### (Against All Defendants)

42. The Commission repeats and realleges paragraphs 1 through 37 of this Complaint as if fully set forth herein.

43. From at least January 2001 through August 2002, the Defendants, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, have knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

44. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a).

## COUNT III

### Fraud in Violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### (Against All Defendants)

45. The Commission repeats and realleges paragraphs 1 through 37 of this Complaint as if fully set forth herein.

46. From at least January 2001 through August 2002, the Defendants, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this

Complaint, have: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which are now operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

47. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3).

## COUNT IV

### Fraud in Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

48. The Commission repeats and realleges paragraphs 1 through 37 of this Complaint as if fully set forth herein.

49. From at least January 2001 through August 2002, the Defendants, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of the securities, as described in this Complaint, have knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

50. By reason of the foregoing, the Defendants, directly or indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b), and Rule 10b-5, 17 C.F.R. § 240. 10b-5, thereunder.

## COUNT V

### Operating as Unregistered Broker-Dealer in Violation of Section 15(a)(1) of the Exchange Act

### (Solely as to Scheinert)

51. The Commission repeats and realleges Paragraphs 1 through 37 of this Complaint as if fully set forth herein.

52. Since a date unknown but from at least January 2001 Defendant Scheinert, directly and indirectly, by use of the means and instrumentality of interstate commerce, while acting as a broker or dealer engaged in the business of effecting transactions in securities for the accounts of others, effected transactions in securities, or induced or attempted to induce the purchase and sale of securities, without registering as a broker-dealer in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b).

53. By reason of the foregoing, Scheinert directly and indirectly, has violated and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

## VI. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I. Declaratory Relief

Declare, determine and find that Defendants Helvetia, Anders, Bachynsky, Scheinert and Dean committed the violations of the federal securities laws alleged in this Complaint.

### II. Permanent Injunctive Relief

Issue a permanent injunction, restraining and enjoining:

(a) Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating: (i) Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2) and 77q(a)(3); and (ii) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder; and (iii) Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c); and

(b) Defendant Scheinert, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, and each of them, from violating Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

### III. Disgorgement

Issue an Order requiring Defendants Helvetia, Anders, Bachynsky, Scheinert and Dean to disgorge all ill-gotten profits or proceeds that they have received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

### IV. Penalties

Issue an Order directing Defendants Helvetia, Anders, Bachynsky, Scheinert and Dean to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### V. Officer and Director Bar

Issue an Order pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), barring Anders from serving as an officer and director of any issuer required to file reports with the Commission pursuant to Sections 12(b), 12(d) or 15(d) of the Exchange Act, 15 U.S.C. §§ 78l(b) and (g), and § 78o(d).

16

### VI. Penny Stock Bar

Issue an Order pursuant to the Court's equitable jurisdiction and Section 603 of the Sarbanes-Oxley Act of 2002 permanently enjoining Defendants Anders, Bachynsky, Scheinert and Dean from directly or indirectly participating in an offering of penny stock, as defined by Rule 3a51-1 under the Exchange Act, 17 C.F.R. § 240.3a51-1.

### VII. Further Relief

Grant such other and further relief as may be necessary and appropriate.

### VIII. Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

June 21st, 2004        By: _/s/ Scott A. Masel_
Scott A. Masel
Senior Trial Counsel
Florida Bar No. 0007110
Direct Dial: (305) 982-6398
masels@sec.gov

Elisha L. Anagnostis
Staff Attorney
Florida Bar No. 0049689
Direct Dial: (305) 982-6392
anagnostisa@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Facsimile:    (305) 536-4154

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET



04-0804

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

CIV-JORDAN

**I. (a) PLAINTIFFS**
SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**
HELVETIA PHARMACEUTICALS, INC., RICHARD A. ANDERS, NICHOLAS BACHYNSKY, ARTHUR SCHEINERT AND LAURENCE DEAN

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** _____
(EXCEPT IN U.S. PLAINTIFF CASES)

Broward 04cv60804 Jordan/Brown

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** BROWARD
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

MAGISTRATE JUDGE BROWN

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Scott A. Masel, Esq. (305) 982-6398
Elisha L. Anagnostis, Esq. (305) 982-6392
SEC, 801 Brickell Ave., #1800, Miami, Fl 33131

**ATTORNEYS (IF KNOWN)**

**(d) CIRCLE COUNTY WHERE ACTION AROSE:** DADE, MONROE, (BROWARD,) PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | **PERSONAL PROPERTY** | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | B☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | B☐ 690 Other | | [X] 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **A LABOR** | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc Security Act | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | A☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions A OR B |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)
15 U.S.C. §§ 77e(a) and 77e(c); 15 U.S.C. § 77q(a) 15 U.S.C.§§77q(a)(2) and 77q(a)(3); 15 U.S.C.§78j(b) and 17 C.F.R.§240. 10b-5; 15U.S.C. §780(b) 15 U.S.C. §780(a)(1). Violations of the federal securities laws.

LENGTH OF TRIAL
via 10 days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ Perm. Inj., Disgorgement and civil penalties
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES [X] NO

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE _____ DOCKET NUMBER _____

DATE June 21, 2004    SIGNATURE OF ATTORNEY OF RECORD
Scott A. Masel, Sr. Trial Counsel

**FOR OFFICE USE ONLY**

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____